Department of Employment Security
No. 2008-412

APPEAL OF JULIE MOTUZAS
(New Hampshire Department of Employment Security)

Argued: April 7, 2009
Opinion Issued: May 1, 2009

*Franklin Pierce Law Center Civil Practice Clinic,* of Concord (*Mary Pilkington-Casey* and *Peter S. Wright, Jr.* on the brief, and *Mr. Wright* orally), for the petitioner.

*Littler Mendelson, P.C.,* of Boston, Massachusetts (*Christopher B. Kaczmarek* on the brief and orally), for the respondent.

DUGGAN, J. The petitioner, Julie Motuzas, appeals a decision of the New Hampshire Department of Employment Security Appeal Tribunal (tribunal), which found that she was terminated by the respondent, Sam's East, Inc. (Sam's Club), for misconduct. On appeal, Motuzas argues that the tribunal based its decision upon impermissible grounds and violated her due process rights. We reverse.

The record supports the following facts. On October 3, 2005, an unidentified woman entered the Sam's Club store in Hudson and stole two 32-inch televisions together valued at approximately $3000. According to Sam's Club, the same woman had been defrauding Sam's Club stores throughout the northeast. The woman, who was not a member of Sam's Club, entered the store empty handed. She proceeded to the sales floor, took a bag of dog food, and went to the membership services desk, where Motuzas was working as an associate. The woman told Motuzas that she would like to return the dog food.

Store policy requires the customer have a door slip to make a return. Door slips are given to customers as they enter a store with merchandise to return, and serve to notify membership service associates that the customer actually brought the item into the store. The policy also requires that a manager become involved in a return transaction when a customer does not have a door slip or a receipt, and, in the absence of a receipt, that refunds be issued on gift cards.

Here, because the woman did not have a door slip, Motuzas directed her to the entrance greeter, who gave her a slip. The woman then gave Motuzas a crumpled partial receipt and asked for a cash refund for five bags of dog food. She told Motuzas that she had bought five bags that were spoiled, and that she had called the manager, Steve Flaherty, the day before to ask for a refund. The woman said that Flaherty instructed her to bring in the unopened bag, and that she could get a cash refund for all five. Believing that Flaherty had authorized the transaction, Motuzas began processing a cash refund. To do so, however, she had to call a supervisor, who performed a "key flick" and entered a code that authorized the cash transaction. The woman then told the supervisor that she had seen children stealing DVDs, causing the supervisor to leave and investigate. Motuzas finished the transaction and gave the woman $163.68 in cash.

The woman then returned to the sales floor, loaded two 32-inch televisions onto a flatbed cart, and proceeded to the exit without paying. The security footage, which did not contain any audio, showed that the exit greeter stopped the woman, who motioned toward the membership services desk. The greeter looked over toward the desk and then let the woman leave. A Sam's Club witness testified at the hearing that the greeter told investigators that Motuzas indicated the woman was free to leave with the televisions. As the woman exited the store, a manager, who was helping another customer carry out a large purchase, again asked the woman if she had a receipt. The manager testified that Motuzas yelled over "she's all set," and that he let her exit with the televisions.

After helping the other customer load the purchase into a car, the manager testified that he returned to the membership desk and directly asked Motuzas if the woman had paid for the televisions, and that Motuzas said she had. Security footage, however, clearly showed that the manager spoke with *a different associate* at the desk, and that Motuzas was helping another customer the entire time he was at the desk talking to the other associate.

A later audit revealed that two televisions were missing, and an investigation ensued. During the investigation, Sam's Club learned that Motuzas had helped the suspect with the dog food refund, and believed that she had also helped the woman steal the televisions. Jacqueline Bell, the regional loss prevention representative, interviewed Motuzas, who remembered the dog food refund, but could not recall anything concerning the televisions. Sam's Club then terminated Motuzas' employment. On the exit interview form, a box was checked indicating that Motuzas was terminated for "Gross Misconduct — Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets)." The form specifically stated that she was terminated for "failure to follow proper refund policy. Not getting mngmt approval — resulting in $3000 + loss."

Following her termination, Motuzas applied for unemployment benefits, stating: "I got accused of letting a member go out the door without paying [for] something when I did not." Although Sam's Club responded that Motuzas had performed an improper refund and helped a woman leave the store with televisions, causing a $3000 loss, it provided no documentation or evidence. The certifying officer therefore granted Motuzas' request for benefits. Sam's Club then appealed to the tribunal, stating: "We wish to appeal the determination based on the following. The claimant was discharged for failing to protect the employers [*sic*] assets which resulted in a $3000.00 loss to employer."

After a hearing, the tribunal found that Motuzas had performed an improper refund and had assisted the woman in leaving with the televi-

sions. The tribunal therefore reversed the decision of the certifying officer, and required Motuzas to reimburse the State for $1816 in overpaid benefits. Motuzas filed a motion to reopen the matter because the tribunal did not view the security tapes, but rather relied upon the testimony of Sam's Club witnesses. The motion was granted for the limited purpose of allowing introduction of the videotapes. After the hearing, to which Sam's Club brought only an edited copy of the security footage, the tribunal issued a decision. A third hearing was required, however, because the tribunal simply retyped its prior decision without any additional findings concerning the video. At that hearing, the tribunal viewed the unedited footage in its entirety, and took additional comments from the parties. Despite the fact that the footage *directly contradicted* the testimony of some of the store's witnesses, the tribunal nonetheless denied Motuzas benefits. Motuzas appealed the decision to the New Hampshire Department of Employment Security Appellate Board (board).

The board found that Motuzas had been prejudiced by the tribunal's consideration of an additional and irrelevant theft by the same woman three days later, as well as by the fact that the tribunal went beyond the limited purpose for reopening by taking new evidence in addition to viewing the security tapes. The board therefore vacated the decision and remanded to the tribunal for a fourth hearing to be held *de novo*.

After the *de novo* hearing, the tribunal found that there was absolutely no evidence supporting the allegation that Motuzas helped the woman steal the televisions. It did, however, conclude that the improper refund alone constituted the type of misconduct warranting denial of benefits under *Appeal of New Hampshire Sweepstakes Commission*, 130 N.H. 659, 664 (1988) (holding that single instance of misconduct is sufficient to deny benefits if it is "a deliberate violation of a company rule reasonably designed to protect the legitimate interests of the employer"). Thus, although the tribunal found that Motuzas had nothing to do with the television theft, it nonetheless reversed the determination of the certifying officer, and required Motuzas to repay $1816 in overpaid benefits. Her appeal to the board and motion for reconsideration were denied; this appeal followed.

On appeal, Motuzas argues that the tribunal erred in: (1) interjecting impermissible grounds for finding misconduct; (2) finding she acted in willful disregard of her employer's best interests; and (3) not giving her adequate notice as to the grounds for her termination, thereby violating her due process rights.

Our review of the tribunal's decision is confined to the record and we will not substitute our judgment for that of the tribunal as to the weight of the evidence on questions of fact. RSA 282-A:67, IV, V (1999). We will, however,

reverse, modify or remand the decision for further proceedings if the substantial rights of the petitioner were prejudiced because the administrative findings, inferences, or conclusions were "unauthorized, affected by an error of law, or clearly erroneous in view of all the evidence presented." *Appeal of Kaplan*, 153 N.H. 296, 298 (2006); *see* RSA 282-A:67, V.

New Hampshire's unemployment compensation system is predicated upon benefits being paid to those who become unemployed through no fault of their own. *Appeal of Lakeview NeuroRehabilitation Ctr.*, 150 N.H. 205, 208 (2003). A person is ineligible for benefits if she is "discharged for misconduct connected with [her] work, if so found by the commissioner." RSA 282-A:32, I(b) (Supp. 2008). Sam's Club argues that it terminated Motuzas for misconduct, and that benefits should therefore be denied.

We first address Motuzas' argument that the tribunal substituted an impermissible justification for denying benefits. In support of her argument, Motuzas relies upon *Smith v. Adams*, 118 N.H. 48 (1978). In *Smith*, an employee missed three days of work because his wife was sick; his employer terminated him, stating that he had quit voluntarily by reason of a three-day unexplained absence. *Smith*, 118 N.H. at 49. The tribunal and trial court both upheld the denial of benefits because of the employee's excessive absenteeism, citing incidents other than the three-day absence. *Id.* at 50. On appeal, we noted that the tribunal has some discretion to determine whether an employee was discharged for misconduct. *Id.* at 51; *see* RSA 282-A:32, I(b). We held, however, that the "inquiry into possible misconduct may not be conducted in disregard of the stated and conceded reason for the termination of an employment relationship." *Smith*, 118 N.H. at 51.

Motuzas argues that Sam's Club saw the improper dog food refund as a connection between her and the woman, but not as a separate incident of misconduct justifying termination. Rather, Sam's Club terminated her solely because of its mistaken belief that she had been complicit in the loss of the televisions, and would not in fact have done so based upon the refund alone. Sam's Club responds that it terminated Motuzas for both the improper refund and the television incident. Thus, it argues, the tribunal did not base the denial of benefits upon a justification other than that for which Motuzas was actually terminated.

Given the parties' disagreement concerning the reason for termination, we must review the record to determine whether a reasonable person could have found that Sam's Club terminated Motuzas on two separate grounds. *See Appeal of Kelly*, 129 N.H. 462, 465 (1987). After a review of the record, we are not persuaded that Sam's Club used the improper return as

independent grounds for Motuzas' termination. The record clearly indicates that Motuzas was discharged because of her perceived complicity in the television theft. Indeed, Sam's Club operated under such a theory until it responded to Motuzas' closing statements at the final *de novo* hearing. As the tribunal found, however, there was no evidence that Motuzas was involved in the television theft. After a review of the record, we cannot help but reach the same conclusion.

Although the exit interview form references the improper refund, it ultimately states that Motuzas was fired for the $3000 loss. When Sam's Club appealed the certifying officer's decision, it stated that Motuzas "was discharged for failing to protect the employers [*sic*] assets which resulted in a $3000.00 loss to employer." When asked by the tribunal at the first hearing why Motuzas was dismissed, Bell stated: "Basically, we lost a couple of televisions and she was primarily involved in the process that the company puts in place in order to prevent that from happening and by not following the procedures." When asked what Motuzas was told when she was terminated, Bell stated: "[I]f the policies had been followed, if a member of management had been called over, if the policies at the door had been handled properly . . . we wouldn't have lost those televisions. . . . [B]y her not following policy and her admittance of not following policy, we lost over $3,000 . . . ."

At the second hearing, which the tribunal held to view the security footage, Motuzas stated: "[W]hen I was told that I was let go it was from doing an improper refund involving a $3,000 loss, which the refund clearly shows that I only did a refund for dog food. It was nothing involved with TVs." At the third hearing, which the tribunal held to view the unedited footage, she again stated that she was told she was discharged for the television loss, and argued that she had nothing to do with that incident. In response, Bell stated that she was fired because her failure to follow policy "resulted in a $3,000 loss, which was those two TVs on this date."

At the final *de novo* hearing, Bell was again asked why Motuzas was terminated. She testified that Motuzas was discharged because "steps were not taken [to protect assets], there was someone that was able to exit our building with two televisions, and there were other ample times, there were circumstances in which there could have been an intervention in that process of her walking out of the building with two televisions . . . ." Bell also testified that store policy was to terminate cashiers causing a loss of more than $500. Although that policy did not apply to Motuzas as a membership services associate, Bell used it as a comparison to demonstrate why the degree of loss in this case merited termination for misconduct. Because it was clear that Sam's Club terminated Motuzas because it believed her

actions resulted in the loss of the televisions, the tribunal's inquiry should have been limited to the theft of the televisions. *See Smith*, 118 N.H. at 51.

Indeed, in closing, Sam's Club stated: "[T]hrough a combination of written documentation, testimony under oath today, and the videotape testimony . . . Sam's Club has established that Ms. Motuzas was terminated for violating company policies that led directly to a loss of in excess of $3,000 . . . ." Motuzas then argued that there was no evidence she had participated in the theft, and that the improper return by itself was not the type of single, deliberate incident that justifies denial of benefits for misconduct. It was only then, at the close of the fourth tribunal hearing, that Sam's Club argued two distinct offenses occurred.

In support of its argument that Motuzas was in fact terminated for the refund, and thus that the two incidents were separate grounds for termination, Sam's Club points out that Motuzas testified that she believed she was "terminated for an improper refund." Reviewing her testimony in context, however, reveals that Motuzas believed she was terminated for an improper refund "that resulted in the loss of $3,000," not a loss of $163.68. In fact, that is precisely what her exit form states.

Because we reverse based upon Motuzas' first argument, we need not address her remaining arguments.

*Reversed.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.